ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
reglet@mainorlawyers.com
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
badams@mainorlawyers.com
JONATHAN T. REMMEL, ESQ.
Nevada Bar No. 8627
jremmel@mainorlawyers.com
**MAINOR EGLET COTTLE**
400 S. Fourth Street, Ste. 600
Las Vegas, Nevada 89101
Ph.: (702) 450-5400
Fax: (702) 450-5451

*Attorneys for Plaintiff,*
*BETTY BRUE*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BETTY BRUE, | Case No.: 2:09-cv-00585-KJD-RJJ |
| Plaintiffs, | |
| vs. | |
| WAL-MART STORES, INC. dba WAL MART STORE #1584; W & W PARTNERSHIP; et. al, | |
| Defendants. | |

## OPPOSITION TO DEFENDANT W & W PARTNERSHIP'S MOTION FOR SUMMARY JUDGMENT

Plaintiff BETTY BRUE, by and through her attorneys of record, ROBERT T. EGLET, ESQ., ROBERT M. ADAMS, ESQ. and JONATHAN T. REMMEL, ESQ., of the law firm MAINOR EGLET COTTLE, hereby files this Opposition to Defendant W & W Partnership's Motion for Summary Judgment ("Opposition").

This Opposition is based upon the following Memorandum of Points and

MAINOR EGLET COTTLE
TRIAL LAWYERS

1  Authorities, the papers and pleadings on file, and any oral argument the Court is willing to

2  entertain at the time of hearing.

3                         **MEMORANDUM OF POINTS AND AUTHORITIES**

4

5                                 **I. FACTUAL STATEMENT**

6          On February 23, 2009, Plaintiff Betty Brue ("Plaintiff") filed her Complaint against

7  Defendant Wal-Mart Stores, Inc. dba Wal-Mart Store #1584 ("Wal-Mart") and Defendant W

8  & W Partnership ("W & W") in Eighth Judicial District Court, State of Nevada.   See

9  "Complaint," attached as **Exhibit 1**.  In her pleading, Plaintiff alleged that Wal-Mart **and** W

10  & W failed to maintain, manage, inspect, supervise and control their premises, and further

11  failed to warn Plaintiff of a known hazardous condition that caused her substantial damages,

12  harms and losses.  Id.  Wal-Mart Store #1584 is located at 3615 So. Rainbow Blvd., Las

13  Vegas, Nevada 89103.   Whereas, Defendant W & W, a Nevada partnership, owns the

14  property where Wal-Mart Store #1584, a named defendant, is located.

15

16          On May 14, 2009, Defendant W & W filed an [Emergency] Motion for Summary

17  Judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Provided that W

18  & W owned the property where Plaintiff fell and was injured, and exercised sufficient

19  control over the property-- as evidenced by the June 18, 2004 Lease Agreement with Wal-

20  Mart -- summary judgment is not appropriate and must be denied.

21

22                                 **II. LEGAL ANALYSIS**

23

24  **A.**      **THE SUMMARY JUDGMENT STANDARD**.

25          Rule 56(c) of the Federal Rules of Civil Procedure states in pertinent part that, "[t]he

26  judgment sought should be rendered if the pleadings, the discovery and disclosure materials

27  on file, and any affidavits show that there is no genuine issue as to any material fact and that

28  the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).  When a

1  motion for summary judgment is properly made and supported, an opposing party may not

2  rely merely on allegations or denials in its own pleading; rather, its response must -- by

3  affidavits or as otherwise provided in this rule -- set out facts showing a genuine issue for

4  trial. If the opposing party does not so respond, summary judgment should, if appropriate,

5  be entered against that party. See Fed. R. Civ. P. 56(e)(2).

6

7      A fact is material if it might affect the outcome of the suit, and a dispute is genuine if

8  the evidence is such that it could lead a reasonable jury to return a verdict for either party.

9  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202

10  (1986). The opponent's burden is to "come forward with 'specific facts showing that there is

11  a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

12  574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). A

13  "genuine" issue of material fact is more than "some metaphysical doubt as to the material

14  facts." Id. A court considering a motion for summary judgment must view the facts in the

15  light most favorable to the non-moving party and give that party the benefit of all reasonable

16

17  inferences that can be drawn from those facts. Matsushita, 475 U.S. at 587.

18

19  **B.     W & W MAY BE LIABLE FOR PLAINTIFF'S DAMAGES AS THE LANDOWNER.**

20      W & W contends that it is a "sham" defendant, named solely to defeat diversity

21  jurisdiction. W & W further contends that Plaintiff failed to state a claim against W & W

22  upon which relief could be granted. These arguments are hardly persuasive provided that in

23  Nevada, a **landowner** may be held liable for failure to exercise reasonable care that results

24  in harm or injury. Moody v. Manny's Auto Repair, 110 Nev. 320, 871 P.2d 935 (1994);

25  Gunlock v. New Frontier Hotel Corp., 78 Nev. 182, 370 P.2d 682 (1962); Riley v. OPP IX,

26  L.P., 112 Nev. 826, 919 P.2d 1071 (1996); Twardowski v. Westward Ho Motels, Inc., 86

27  Nev. 784, 476 P.2d 946 (1970); Wagon Wheel Saloon and Gambling Hall, Inc. v.

28

MAINOR EGLET COTTLE

3

Mavrogan, 78 Nev. 126, 369 P.2d 688 (1962); Basile v. Union Plaza Hotel and Casino, 110 Nev. 1382, 887 P.2d 273 (1994); Sprague v. Lucky Stores, Inc., 109 Nev. 247, 845 P.2d 320 (1993); Davenport v. Comstock Hills-Reno, 118 Nev. 389, 46 P.3d 62 (2002); Joynt v. California Hotel & Casino, 108 Nev. 539, 835 P.2d 799 (1992); Rockwell v. Sun Harbor Budget Suites, 112 Nev. 1217, 925 P.2d 1175 (1996); Bass-Davis v. Davis, 122 Nev. 442, 134 P.3d 103 (2006). **Admittedly, W & W owned the premises where Plaintiff fell and was injured**. Accordingly, W & W, as a landowner, may be liable for Plaintiff's damages, harms and losses pursuant to age old Nevada premise liability law.

### 1.   THE LEASE AGREEMENT DOES NOT NEGATE W & W'S DUTY.

The fact that W & W leased its premises to Wal-Mart, does not negate its duty to keep the premises safe for others, because such obligations are non-delegable. See 62 AM JUR 2d PREMISES LIABILITY §11. In Coblentz v. Hotel Employees & Restaurant Employees Union Welfare Fund, 112 Nev. 1161, 925 P.2d 496 (1996), the Supreme Court of Nevada held that a owner/landlord who leases property to an occupier/tenant may be liable for harm where it caused, knew of, or should have known of a dangerous condition. Whether W & W caused, knew of, or should have known of the dangerous condition which caused Plaintiff injuries, or was negligent in these regards, is factual in nature and must preclude summary judgment. Frances v. Plaza Pacific Equities, 109 Nev. 91, 847 P.2 722 (1993) (Issues of negligence and proximate cause are usually factual issues to be determined by the trier of fact).

Similarly, in Lopez v. Superior Court, 45 Cal. App. 4th 705 (Cal. App. 1996), the court of appeals held that a commercial landlord has a duty to both the tenants and the public to maintain the premises in a reasonably safe condition. In Lopez, a patron of a market slipped on a grape while shopping. Recognizing this as a foreseeable and relatively

4

common condition, the court determined that the **landlord** should have taken reasonable steps to abate the hazard. The landlord had leased the premises to a commercial tenant, but contractually retained the right to enter the property for the purpose of inspection and any other purpose. The Lopez court held that this retained right permitted the owner/landlord the opportunity to inspect, detect and correct any existing or potential safety hazards.

Here, W & W maintained its right to enter its commercial property for any purpose. See "Lease Agreement," paragraph 11, attached as **Exhibit 2**. Specifically, the Lease Agreement states that, "Lessor [W & W] shall have the right to enter the Demised Premises at all reasonable times *to examine the condition thereof and to make all necessary repairs* required of Lessor [W & W] under this Lease, but such rights shall be exercised in a manner so as not to interfere unreasonably with the business of Lessee [Wal-Mart]." Id (emphasis added). Like the defendant landlord in Lopez, W & W retained its duty to inspect, detect and correct any existing or potential safety hazards, and therefore, may be liable for all of Plaintiff's substantial harms, damages or losses.

## 2.   W & W May Be Liable Under Multiple Theories of Negligence.

Yet another factual issue which precludes summary judgment, but may impose liability against W & W for Plaintiff's damages, is whether the defendant owner was instrumental in the construction or design of the building where Plaintiff fell and was injured. Most states, including Nevada, apply the doctrine of strict liability to products or materials supplied or manufactured by third parties. Fyssakis v. Knight Equip. Corp., 108 Nev. 212, 826 P.2d 570 (1992). California and other states have recognized that mass producers of houses, stand in the same shoes as mass procedures of consumer goods. This doctrine could also apply to mass procedures of commercial properties, like Wal-Mart or other commercial properties, that are identical in design and operation, regardless of their

MAINOR EGLET COTTLE

1    particular location.   Where a dangerous condition results from mass production, strict

2    products liability can and should apply.  <u>Kriegler v. Eichler Homes, Inc.</u>, 269 Cal. App. 2d

3    224 (Cal. App. 1969); <u>see</u> <u>also</u>, <u>Duncavage v. Allen</u>, 147 Ill. App. 3d 88 (Ill. App. 1986);

4    <u>Richwind Joint Venture 4 v. Brunson</u>, 335 Md. 661 (1994); <u>Scott v. Missouri Inv. Trust</u>, 753

5    S.W.2d 435.

6

7         W & W may also be liable for negligent maintenance of the property if they knew or

8    acquiesced to activities that created the dangerous condition.     <u>Morden v. Mullins</u>, 153

9    S.E.2d 629, 631 (Ct. App. Ga. 1967); 62 AM JUR 2d PREMISES LIABILITY §24 (2008).

10   Co-owners or possessors owe third parties a duty to exercise ordinary care in maintaining

11   the premises in such a manner so as to avoid injury to a third party, **even though just the**

12   **possessor of the property has exclusive control or management of the property.**  62 AM

13   JUR 2d PREMISES LIABILITY §24 (2008).  Here, discovery may bear out that W & W

14   had notice of the activities, maintenance protocol, and/or mode(s) of operation(s) utilized by

15   Wal-Mart and could have required its tenant to take certain precautions to guard against

16   foreseeable hazards.  Failure to guard against foreseeable hazards may be another means

17   whereby liability is imposed against W & W, as well as the tenant occupier, Wal-Mart.

18

19        Further yet, the relationship between W & W and Wal-Mart may rise to the status of

20   a joint venture.  A joint venture exists when there is a contractual relationship in the nature

21   of an informal partnership wherein two or more persons conduct some business enterprise,

22   agreeing to share jointly, or in proportion to capital contributed, in profits and losses.

23   <u>Radaker v. Scott</u>, 109 Nev. 653, 658 (1993).  In the absence of an agreement between the

24   venturing parties, facts from which an agreement may reasonably be implied can create a

25   joint venture.  <u>Bruttomeso v. Las Vegas Metro Police Dep't.</u>, 95 Nev. 151, 154 (1979).  "A

26   joint venture is determined by the application of ordinary rules concerning the interpretation

and construction of contracts as well as considerations of the actions and conducts of the parties." Radaker at 658. Consequently, the negligence of one venturer, may be imputed to co-venturers so as to tender the latter liable for injuries sustained by third parties. Id.

As the facts present themselves, it is conceivable that Wal-Mart and W & W, through their prior and current business dealings created a joint venture. Because of the Defendants' contractual agreement, or other facts that imply a joint venture, this is a viable claim that will be pursued throughout discovery; the end result of which will likely impose liability against W & W.

## C.   W & W MAY BE LIABLE TO PLAINTIFF FOR PUNITIVE DAMAGES.

Defendants may be liable for punitive damages. NRS 42.005(1), regarding punitive damages, states:

> 1.   Except as otherwise provided in NRS 42.007 in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant.

In Coughlin v. Tailhook Association, Inc., 818 F. Supp. 1366 (U.S. Dist. Ct., D. Nev. 1993), the U.S. District Court was faced with a diversity case and had to determine how the Nevada Supreme Court would decide the issue. The U.S. District Court noted:

> In order to maintain an action for punitive damages under Nevada law, [Plaintiff] must allege facts demonstrating that [Defendants] [are] guilty of "oppression, fraud, or malice, express or implied," See NRS § 42.055(1). Unfortunately, Nevada case law defining those terms is less than clear.

> The controversy in this area of Nevada law is over what constitutes "malice." Nevada case law distinguishes between "malice in law" and "malice in fact." No matter what label is applied, the basic difference the two concepts is that malice in fact requires the Plaintiff to show a deliberate motive or intent to vex, harass, annoy, or injure and malice in law is satisfied if a person takes

excessive risks at the expense of injury to another without having an intent to injure. [Footnote omitted.] Coughlin at 1370.

The Coughlin opinion notes that "malice in fact" and "malice in law" are sometimes referred to as "express malice" and "implied malice" respectively. Coughlin, footnote 4 at 1370.

Here, the facts may support that W & W exercised a reckless disregard for the safety of its customers, including Plaintiff, by virtue of its failure to implement reasonable and timely inspections, cleanings and/or maintenance of the premises, despite actual or constructive knowledge of hazardous condition(s) on its property. Although W & W may not have harbored a specific intent to injure Plaintiff, it nevertheless, might have taken excessive risks of foregoing reasonable and timely inspections, cleanings or maintenance of its property, at the expense of Plaintiff. If W & W had not taken such excessive risks, Plaintiff would not have suffered such substantial injuries and losses. Accordingly, summary judgment of Plaintiff's punitive damage claim is not warranted.

**D.  NEVADA IS A NOTICE PLEADING STATE.**

Nevada is a notice pleading state. In her Complaint, Plaintiff alleged that W & W violated codes, rules, regulations, statutes, and ordinances which are specifically designed to protect customers, including Plaintiff, from sustaining the type of injuries she sustained when a hazardous condition existed on the premises. See Exhibit 1. These specific codes, rules, regulations, statutes and ordinances will be ferreted out as discovery proceeds. These might include, but are not limited to, local or state building codes, OSHA regulations, or similar statutes or ordinances.

1    Notwithstanding, if the Court is inclined to dismiss Plaintiffs' claims because

2  Plaintiff failed to specifically plead these codes, regulations, statutes and ordinances in her

3  Complaint, leave of Court should be granted to allow Plaintiff the opportunity to amend her

4  pleading, as justice so requires.  See Fed. R. Civ. P. 15(a)(2); see also, Adamson v. Bowker,

5
6  85 Nev. 115, 450 P.2d 796 (1969).  Otherwise, Plaintiff has adequately met these several

7  standards by setting for specific causes of actions against W & W, as well as Wal-Mart,

8  wherein the elements of each cause of action are separately plead.  Provided that relief could

9  be granted for Plaintiff's claim for negligence per se, summary judgment is not warranted

10 and must be denied.

11

12 **E.      W & W's Motion Should Have Been Made Against Wal-Mart.**

13    If summary judgment is to be entered here, it should be in favor of W & W against

14 Wal-Mart, and not against Plaintiff.   W & W has taken the position that it is owed

15 contractual indemnity from Wal-Mart under the terms of the Lease Agreement.  *Wal-Mart,*

16 *who at the time of this filing were represented by the same attorneys as W & W, concede*

17
   *that they owe W & W contractual indemnity.*[1]  Here, the Court may determine, as a matter
18
19 of law, whether Wal-Mart is contractually obligated to indemnify W & W, and accept tender

20 of its defense.  Rather than address this more obvious issue, W & W filed it Motion for

21 Summary Judgment against the Plaintiff, on an "emergency basis" to have the mattered

22 considered before the Court had an opportunity to consider Plaintiff's Motion to Remand

23 which was filed on April, 29, 2009.

24

25 **F.      Remand Should Be Considered Before Summary Judgment.**

26    Defendants have taken the position, that if the Court grants summary judgment in W

27 ───────────────
[1] The Court should note, based on the indemnity language of the Lease Agreement, a direct conflict exists
   between W & W and Wal-Mart in being represented by the same counsel.  Though another firm recently filed
28 an "Association of Counsel," this does little to guard against any conflict that Rule 1.7 of the Nevada Rules of
   Professional Conduct was designed to guard against.

& W's behalf, diversity jurisdiction is satisfied and the matter must remain in Federal Court. The opportunity to move for summary judgment, however, is not limited to the confines of this federal setting. Rather, after the course of open and full discovery, should the evidence support W & W's defenses, and free them of liability for Plaintiff's substantial and life altering injuries, W & W could likewise move for summary judgment, pursuant to Rule 56 of the Nevada Rules of Civil Procedure, and seek an identical remedy in a state setting. See NRCP 56(c).

Rather than allow the Court to consider Plaintiff's timely request to remand the matter, Defendant, in essence, interrupted the flow of more pertinent matters, by filing the present motion on an "emergency basis." Based on the foregoing, there was no real "emergency" and the Court should not consider this request until *after* it has ruled on Plaintiff's Motion to Remand.

### III. **CONCLUSION**

Based on the foregoing, Plaintiff respectfully request that this Court **first** consider Plaintiff's Motion to Remand, before considering whether summary judgment should be granted in W & W favor, against Plaintiff. If the Court is inclined to consider W & W's Rule 56(c) request, on an alleged "emergency basis," Nevada premises liability law, in addition to persuasive case law from other jurisdictions, clearly imposes liability against a owner/landlord who, despite having a contractual right to enter and inspect it premises,

. . .

. . .

. . .

. . .

. . .

failed to act reasonably towards a customer who was injured on its property.  Whether W &

W was negligent in this, or any other regard, is for the trier of fact to decide.  Accordingly,

summary judgment must be DENIED.

DATED this 22nd day of May, 2009.

**MAINOR EGLET COTTLE**

/s/ Jonathan T. Remmel, Esq.

_____

ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
JONATHAN T. REMMEL, ESQ.
Nevada Bar No. 8627
400 S. Fourth Street, Ste. 600
Las Vegas, Nevada 89101

**CERTIFICATE OF MAILING**

Pursuant to N.R.C.P. 5(b), I hereby certify that I am an employee of MAINOR EGLET COTTLE, and that on the 22nd day of May, 2009, I deposited for mailing, postage prepaid, at Las Vegas, Nevada, the foregoing **OPPOSITION TO DEFENDANT W & W PARTNERSHIP'S MOTION FOR SUMMARY JUDGMENT** in the above matter addressed as follows

Jennifer Lynn Lewkowski, Esq.
Phillips Spallas & Angstadt
504 S. Ninth Street
Las Vegas, NV 89101
Attorneys for Defendant Wal-Mart

Robert P. Molina, Esq.
Pyatt Silvestri & Hanlon
701 Bridger Avenue, Ste. 600
Las Vegas, NV 89101
Attorneys for Defendant W & W Partnership

/s/ Kathy Szanyi
An employee of Mainor Eglet Cottle

# EXHIBIT 1

ORIGINAL

FILED

FEB 23  5 23 PH '09

CLERK OF THE COURT

**COMP**
Robert T. Eglet, Esq.
Nevada Bar No. 3402
reglet@mainorlawyers.com
Robert M. Adams, Esq.
Nevada Bar No. 6551
badams@mainorlawyers.com
Jonathan T. Remmel, Esq.
Nevada Bar No. 8627
jremmel@mainorlawyers.com
**MAINOR EGLET COTTLE**
400 S. Fourth Street, Ste. 600
Las Vegas, Nevada 89101
Ph.: (702) 450-5400
Fax: (702) 450-5451
Attorneys for Plaintiff

### DISTRICT COURT

### CLARK COUNTY, NEVADA

| | |
|---|---|
| BETTY BRUE, ) | CASE NO. A58332 |
| ) | DEPT. NO. |
| Plaintiffs, ) | X |
| ) | |
| vs. ) | |
| ) | |
| WAL-MART STORES, INC. dba WAL ) | |
| MART STORE #1584; W & W ) | |
| PARTNERSHIP; DOE EMPLOYEES 1 ) | |
| through 5; DOES 1 through 10; and ROE ) | |
| CORPORATIONS 1 through 10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### COMPLAINT

Date of Hearing: N/A
Time of Hearing: N/A

Plaintiff alleges as follows:

–1–

# GENERAL ALLEGATIONS

1.      That all at all times relevant hereto, Plaintiff was a resident of Clark County, Nevada.

2.      That all the facts and circumstances that give rise to the subject lawsuit occurred in Clark County, Nevada.

3.      That at all times relevant hereto, Defendant WAL-MART STORES, INC. dba WAL MART STORE #1584, was and is a foreign corporation licensed to conduct business in the State of Nevada.

4.      That at all times relevant hereto, Defendant W & W PARTNERSHIP, was and is a Nevada partnership, with Nevada partners, licensed to conduct business in the State of Nevada.

5.      That the true names and capacities, whether individual, corporate, association or otherwise of the Defendants, DOE EMPLOYEES 1 through 5 and/or DOES 1 through 10 and/or ROE CORPORATIONS 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereupon alleges, that each of the Defendants designated herein as DOE EMPLOYEES, DOES and/or ROE CORPORATIONS are responsible in some manner for the events and happenings herein referred to, and in some manner caused the injuries and damages proximately thereby to the Plaintiff, as herein alleged; that the Plaintiff will ask leave of this court to amend this Complaint to insert the true names and capacities of said Defendants, DOE EMPLOYEES 1 through 5 and/ or DOES 1 through 10 and/or ROE CORPORATIONS 1 through 10, inclusive, when the same have been ascertained by Plaintiff, together with the appropriate charging allegations, and to join such Defendants in this action.

MAINOR EGLET COTTLE
TRIAL LAWYERS

6.     That at all times herein mentioned, Defendants, including DOE EMPLOYEES 1 through 5 and/or DOES 1 through 10 and/or ROE CORPORATIONS 1 through 10, inclusive, were the employees and/or owners and/or operators and/or maintainers of the location(s) involved in the accident fully described herein below.

7.     At all times mentioned, the Defendants, and each of them, were the maintainers, owners, managers, inspectors, supervisors and controllers of the premises and common areas generally known as WAL MART STORE #1584, located at or near 3615 S. Rainbow Blvd., Las Vegas, Clark County, Nevada.

## FACTS COMMON TO ALL CAUSES OF ACTION

8.     That Plaintiff incorporates by this reference each and every allegation previously made in this Complaint, as if here fully set forth.

9.     On or about August 2, 2008, Defendants, while in the course and scope of their employment and/or agency with other Defendants, negligently failed to maintain, manage, inspect, supervise and control the premises and further failed to warn Plaintiff BETTY BRUE, of hazards which resulted in Plaintiff's injuries.

10.  As a direct and proximate result, Plaintiff, BETTY BRUE, slipped and fell, was seriously injured and caused to suffer great pain of body and mind, some of which conditions are permanent and disabling all to her general damage in an amount in excess of Ten Thousand Dollars ($10,000.00).

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

11.    That Plaintiff incorporates by this reference each and every allegation previously made in this Complaint, as if here fully set forth.

–3–

12.     On or about August 2, 2008, Defendants, while in the course and scope of their employment and/or agency with other Defendants, negligently failed to control, supervise, repair, inspect and maintain the premises and further failed to warn Plaintiff, BETTY BRUE, of hazards which resulted in Plaintiff's injuries.

13.     Defendants breached their duty of due care by their negligent, careless, wanton, willful, and indifferent failure to act including, but not limited to, the negligent and improper control, supervision, repair, inspection and maintenance of the subject premises.

14.     As a direct and proximate result of the conduct of the Defendants described hereinabove, Plaintiff has sustained damages in excess of TEN THOUSAND DOLLARS ($10,000.00).

15.     Defendants have acted willfully and maliciously, and with oppression, fraud, or malice, and as a result of Defendants' wrongful conduct, Plaintiff is entitled to an award of exemplary or punitive damages.

16.     As a result of Defendants' conduct, as set forth herein, Plaintiff has been required to retain the services of an attorney, and, as direct, natural, and foreseeable consequence thereof, has been damaged thereby, and is entitled to reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (NEGLIGENCE PER SE)

17.     Plaintiff incorporates by this reference each and every allegation previously made in this Complaint, as if here fully set forth.

18.     At all times mentioned herein, there were in force statutes, ordinances, uniform building codes and regulations prohibiting the conduct exhibited by Defendants, including DOE EMPLOYEES 1 through 5 and/or DOES 1 through 10 and/or ROE CORPORATIONS 1 through 10.

19.     Defendants did not perform their duties to control, supervise, repair, inspect and

4

maintain the subject premises in accordance with applicable codes, rules, regulations, statutes, and ordinances. Thus, Defendants negligently violated the codes, rules, regulations, statutes, and ordinances which was a direct and proximate cause of and contributed to the slip and fall which injured Plaintiff.

20.    The codes, rules, regulations, statutes, and ordinances were designed to protect this class of Plaintiffs from the type of injuries sustained on the day at issue.

21.    As a direct and proximate result of the conduct of the Defendants described hereinabove, Plaintiff has sustained damages in excess of TEN THOUSAND DOLLARS ($10,000.00).

22.    As a result of Defendants' conduct, as set forth herein, Plaintiff has been required to retain the services of an attorney, and, as direct, natural, and foreseeable consequence thereof, has been damaged thereby, and is entitled to reasonable attorneys' fees and costs.

23.    Defendants have acted willfully and maliciously, and with oppression, fraud, or malice, and as a result of Defendants' wrongful conduct, Plaintiff is entitled to an award of exemplary or punitive damages.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

1    WHEREFORE, Plaintiff prays judgment of this Court as follows:

2    1.    General damages in an amount in excess of $10,000.00;

3    2.    Special damages in an amount in excess of $10,000.00;

4    3.    Punitive damages to punish Defendants and deter such conduct

5    4.    Cost of suit; pre-judgment interest; post-judgment interest; attorney's fees; and

6    5.    For such other and further relief as is just and proper.

7    DATED this 23rd day of February, 2009.

8                                    MAINOR EGLET COTTLE

9

10

11

12    By _____
      ROBERT T. EGLET, ESQ.
13    Nevada Bar No. 3402
      ROBERT M. ADAMS, ESQ.
14    Nevada Bar No. 6551
      JONATHAN T. REMMEL, ESQ.
15    Nevada Bar No. 8627
      400 South Fourth Street, Suite 600
16    Las Vegas, Nevada 89101
      Attorneys for Plaintiffs
17

18

19

20

21

22

23

24

25

26

27

28                                    –6–

# EXHIBIT 2

# RESTATED LEASE AGREEMENT

THIS RESTATED LEASE AGREEMENT (the "Lease") is executed as of the ___ day of July 2004, by and between W & W PARTNERSHIP, a Nevada general partnership, with offices at 3635 S. Rainbow Blvd., Ste. 100, Las Vegas, Nevada 89103, Federal Tax I.D.# 88-0274034 (hereinafter "Lessor"), and WAL-MART REAL ESTATE BUSINESS TRUST, a Delaware statutory trust, with offices at 702 S.W. Eighth Street, Bentonville, Arkansas 72716 and a mailing address of 2001 S.E. Tenth Street, Bentonville, Arkansas 72716 (hereinafter "Lessee").

This Lease restates and replaces in its entirety that Lease Agreement dated April 4, 1990, between Wal-Mart Stores, Inc. ("Stores") and RJW Properties West Ltd. ("RJW"), as amended by separate First Amendments to Lease dated August 1, 1990, and August 16, 1990, respectively, between Stores and RJW, and by separate Second Amendments to Lease dated February 13, 1991, and July 26, 1991 respectively, by and between Stores and Rainbow Springs, Inc. ("RSI"), a Nevada corporation, successor by assignment to RJW (collectively referred to as "Original Lease Agreement"). Lessor is the successor by assignment to RSI. Lessee is the successor by assignment to Stores.

Notwithstanding anything to the contrary in this Lease, this Lease shall not become effective, and the Original Lease Agreement shall remain in full force and effect until the date Lessee obtains the issuance of a building permit from the County of Clark, a political subdivision of the State of Nevada ("Clark County") with respect to its proposed expansion of its existing retail store (the "Expanded Store") on the Demised Premises (as defined below) (the "Effective Date"). Upon the Effective Date, this Lease shall become effective, and the Original Lease Agreement shall thereafter be replaced and restated in its entirety by this Lease.

## WITNESSETH:

1. **DEMISED PREMISES:**

   (a)    Lessor, in consideration of the covenants and agreements hereinafter contained, does hereby demise and lease to Lessee certain real property, including an existing approximately 120,680 square foot building, including the garden center (the "Building") together with all other improvements thereon (the real property, such Building, and improvements are hereinafter collectively the "Demised Premises") legally described in Exhibit A attached hereto and made a part hereof, which is part of the Shopping Center depicted on the Site Plan (the "Site Plan") attached hereto as Exhibit B (hereinafter the "Shopping Center"), to have and to hold during the Term (as defined in Section 2). Upon issuance of the Certificate of Occupancy (the "CofO") by the applicable governmental regulator (the "CofO Date"), the Demised Premises shall include the Expanded Store area of an approximately 81,279 square foot structural improvement. Upon completion of the Expanded Store, the Demised Premises shall be comprised of an approximately 201,959 square foot building, plus an approximately 21,310 square foot garden center, an approximately 690 square foot canopied

-1-

CMM:emm 437094.15 6/15/2004

remote pharmacy, and (as applicable) a storage container area. The Demised Premises and the Shopping Center are located in Clark County.

(b) It is understood and agreed that throughout the Term, Lessee and its agents, employees, customers, contractors, sublessees, licensees and concessionaires shall have a nonexclusive right to use the Common Areas (as defined in Section 28) together with all improvements and appurtenances now and hereafter located therein, including, but not limited to the parking areas in the Shopping Center and the rights of entrance and exit over all streets, alleyways and parking lots upon and appurtenant to the Shopping Center, in common with the agents, employees and customers of other stores in the Shopping Center, for the purposes of ingress and egress on foot and by motor vehicles and for parking motor vehicles in the Shopping Center, for loading and unloading merchandise and for the display of merchandise. Lessee shall be permitted to use the area depicted on Exhibit "B" for use of seasonal sales structures related to the sale of Lessee's merchandise or sales of Lessee's merchandise, provided that use(s) combined do not exceed 100 calendar days per year. Seasonal sales shall not include third party kiosks, concessionaires, carnivals or auto sales. Lessee agrees that its use of the parking area and common area shall not unduly impede or interfere with the flow of traffic or obstruct access to other tenants' places of business. Lessee agrees that it shall observe reasonable regulations furnished in writing by Lessor concerning the parking of employees' cars and the maintaining of an orderly flow of vehicular and pedestrian traffic in and about the Shopping Center.

2. **TERM:** The Term shall commence on the Effective Date (the "Commencement Date") and shall expire fifteen (15) years thereafter, subject, however, to the provisions of Section 24 concerning extensions or renewals hereof (collectively, including any exercised extensions or renewals, the "Term"). The term "Lease Year" shall have the following meanings: the first "Lease Year" shall be the period which commences on the Commencement Date and terminates on the next-following January 31st. Each subsequent Lease Year (other than the last Lease Year) shall be a period that commences on February 1st of one year and terminates on the next-following January 31st. The last Lease Year shall be the period that commences on the last February 1st occurring during the Term and terminates on the last day of the Term. The parties recognize that the first Lease Year and the last Lease Year may be periods of less than twelve (12) full calendar months.

3. **RENTAL:** Lessee shall pay to Lessor as rent for the Demised Premises a fixed annual rent (hereinafter the "Rent") as follows: (a) from the Effective Date this Lease until the issuance of a Certificate of Occupancy for the Expanded Store (the "CofO Date"), Rent shall be equal to the amount that was payable by Lessee to Lessor immediately prior to the Effective Date as "Minimum Rent" under Section 3 of the Original Lease Agreement and "Percentage Rent" under Section 32 of the Original Lease Agreement (Sections 3 and 32 of the Original Lease Agreement being hereby incorporated in this subsection) and (b) upon and after the CofO Date, Rent shall equal Nine Hundred Eighty-Nine Thousand and NO/100 Dollars ($989,000), payable in advance in equal successive installments on the first day of each and every calendar month during the Term, subject to adjustment for a fractional first month; provided that the annual rent shall increase by 10% on and with the second 5-year renewal term as provided in Section 24 below and then thereafter increase by 10% from what was payable immediately preceding on and with every other 5-year renewal term thereafter (i.e., with the fourth, sixth, eighth, tenth, twelfth, and fourteenth renewal terms). Lessee agrees that in the event any monthly installment of Rent is not paid by the 10th day of the month in which same is due, additional rent equal to ten

-2-

percent (10%) of the monthly Rent shall be paid by Lessee for each such month. Lessor agrees to provide Lessee with a fully completed and properly signed US Department of Treasury form W-9 at least sixty (60) days prior to the Commencement Date. No Rent shall be paid until Lessee receives the form W-9.

4. **ACCEPTANCE OF LESSEE'S BUILDING:** Within sixty (60) days of the Effective Date (or as otherwise noted below), Lessor will complete and send to Lessee the following:

(a) Certificates of insurance as required herein within ten (10) days of Lessee's request for a Certificate of Occupancy from Clark County;

(b) Completion of the Real Property Tax Guidelines attached hereto as Exhibit C;

(c) A fully executed and properly recorded copy of the Second Amendment to Easements With Covenants and Restrictions Affecting Land (the "Second Amendment"), attached as Exhibit D, amending Easements With Covenants and Restrictions Affecting Land dated February 28, 1991, and Easements with Covenants and Restrictions Affecting Land dated March 26, 1992, and Amendment thereto date January 11, 2000 (the "ECR's"); and

(d) A fully executed Short Form/Memorandum of Lease as provided for in Section 26 of this Lease.

Notwithstanding the foregoing but subject to Section 10 below, Lessee shall cause its contractor to obtain a Builders Risk Policy, naming Lessor as additional insured and furnish an endorsement consistent therewith, the amount of which shall be not less than the replacement value of the Demised Premises and the premises of the adjacent south wing tenants in the Shopping Center.

5. **USE OF PREMISES:** Lessor agrees that the Demised Premises may be used for any lawful purpose. It is expressly agreed that nothing contained in this Lease shall be construed to contain a covenant, either express or implied, to either commence the operation of a business or thereafter continuously operate a business in the Demised Premises. Lessor recognizes and agrees that Lessee may, at Lessee's sole discretion and at any time during the Term, cease the operation of its business in the Demised Premises; and Lessor hereby waives any legal action for damages or for equitable relief which might be available to Lessor because of such cessation of business activity by Lessee.

6. **EQUIPMENT, FIXTURES AND SIGNS:** Lessee shall have the right to erect, install, maintain and operate on the Demised Premises such equipment, fixtures and signs as Lessee may deem advisable, subject to local ordinances. It is understood that any work of any kind made and done under this Section shall be made and done at Lessee's sole cost, and Lessee agrees to indemnify and hold Lessor harmless from any and all mechanics' liens that may be filed by reason thereof. In the event of the ultimate removal of any personal property, equipment or fixtures, including signs, Lessee agrees to repair any damage resulting therefrom.

7. **MAINTENANCE BY LESSOR:** Lessor shall maintain the Common Area and parking lot including striping and cleaning and removal of dirt, rubbish and snow (subject to

-3-

CMM:mm 437094.15 6/15/2004

Section 28 below). However, Lessor shall not be obligated to re-stripe the parking lot prior to the Effective Date. Lessor shall be obligated to re-stripe the parking lot at the point such becomes necessary after issuance of the CofO. Lessor shall make any repair or replacement to said improvements resulting from defective materials and/or workmanship or construction not in accordance with applicable government regulations at Lessor's sole cost and expense. Notwithstanding the foregoing, Lessee shall be responsible for the parking lot improvements required as a result of the construction of the Expanded Store. If Lessor, within fifteen (15) days after Lessee shall give written notice to Lessor, shall fail to make the repairs required of Lessor herein, or in the event of an emergency which, in the opinion of Lessee, renders such notice impracticable, Lessee may, at its option, make the repairs, in which event Lessor covenants to reimburse Lessee for the cost thereof and for ten percent (10%) of said cost for administration fees. If within fifteen (15) days after Lessee has given such notice to Lessor, Lessor shall fail to reimburse Lessee for the cost of such work and the administration fee, Lessee may deduct such costs from rent and/or any other sums then or thereafter due to Lessor under this Lease. Notice shall be deemed given as provided hereinafter in Section 25.

8.    **MAINTENANCE BY LESSEE:** Lessee shall maintain in good and usable repair the exterior and interior portions and structural elements of the Building and the appurtenances thereto and any improvements on the Premises, including without limitation the roof, roof structures and supports; foundation and structural supports; walls and floors; sprinkler systems, pipes, wires and conduits within the floors, walls and above the ceiling; gutters, downspouts and canopy; vestibule frame, exterior security lighting; utility lines within the Building to the extent not maintained by public utility companies; and paint on the exterior walls and other exterior portions of the entire Building. This work may be performed by Lessee's employees or by others, at Lessee's discretion. Lessee shall also maintain the interior of the Demised Premises (the area within the walls, including the paint on said walls, the ceiling and the floor covering) and shall repair any damage caused by any act of negligence of Lessee, its contractors, licensees, agents or employees. Lessee agrees to replace and/or repair broken glass in the windows or doors, replace interior light bulbs and ballasts and to repair or replace as necessary door closures, floor coverings and sewer line blockage. Lessee shall maintain the parking lot lights designated "W-M" on either the Site Plan attached hereto as Exhibit B or on Exhibit H or I as applicable. Lessor agrees to assign or cause its contractors to assign to Lessee all contractors' or subcontractors' guarantees or warranties relating to any construction work which Lessee is obligated to repair or maintain. At the expiration of this Lease or any renewal hereof, Lessee agrees to surrender promptly the Demised Premises to Lessor in the same condition as when received, ordinary wear and tear, effects of time and destruction by fire, the elements or other unavoidable casualties excepted. Lessee agrees that Lessor shall have the option, at Lessor's sole discretion, to (i) participate in the cost associated with the deferred maintenance or replacement necessary for the existing roof of the original Building on the Demised Premises (excluding the garden center and any previously expanded garden center and seasonal sales area) and the joinder of same to the Demised Premises (the "Deferred Maintenance") on a pro-rata basis as established by Lessee with notice to Lessor or (ii) provide Lessee with a credit to the Rent otherwise payable under Section 3 above, in the amount of Lessee's out of pocket costs and expenses for such Deferred Maintenance, which Deferred Maintenance exists as of the Effective Date, provided that Lessee shall, prior to or within thirty (30) days after the Effective Date, provide Lessor, for Lessor's review and approval, with a written itemization of the costs and expenses for such Deferred Maintenance (the "Rent Credit" or "Cost Participation", whichever shall be applicable). In the event that Lessor does not elect the Cost Participation in writing, then

the Rent Credit shall be deemed applicable and shall be paid to Lessee by deducting from the monthly payment of Rent paid to Lessor by Lessee on and after the CofO Date a sum equal to the difference between the Rent payable by Lessee after the CofO Date as set forth in Section 3 hereof and the Minimum Rent under Section 3 of the Original Lease Agreement until the Rent Credit has been paid in full. In the event that Lessor elects the Cost Participation, Lessor shall issue joint payment to Lessee and contractor consistent with approved pay applications submitted to Lessee within thirty (30) days of such becoming due, provided Lessor is furnished with thirty (30) days notice.

9.    **CARE OF PREMISES:** Lessee agrees to keep the Demised Premises in a neat and clean condition, shall not permit any nuisance or fire hazard therein, shall not knowingly permit any unlawful or immoral practice within the Demised Premises, and shall at all times comply in its occupancy and use of the Demised Premises with all city and county ordinances and with all State and Federal laws and regulations relating thereto.

10.   **INSURANCE:** Lessee shall procure and pay the premium for liability insurance in the amounts of Two Million Dollars ($2,000,000.00) with respect to injuries to any one person, Two Million Dollars ($2,000,000.00) with respect to any one accident, and Two Million Dollars ($2,000,000.00) with respect to property damage to protect Lessee and Lessor against liability for such injury to persons and such damage upon and within the Demised Premises. Lessee agrees to indemnify and hold Lessor harmless for any losses incurred in excess of the insurance coverages stated herein. In addition, Lessee agrees to carry All-Risk hazard insurance on the Demised Premises for an amount providing coverage for the full replacement cost of the Demised Premises. Said insurance policy shall provide that it shall not be cancelled except on thirty (30) days prior written notice to Lessor. In the event of either Partial Destruction or Total Destruction of the Demised Premises, as each such term is defined in Section 17 below, Lessee shall assign the proceeds of said insurance policy to Lessor who shall use the proceeds pursuant to Section 17 below. In the event Lessee is self-insuring at the time of such casualty, Lessee shall provide funds to Lessor so that Lessor can remedy any such loss. Lessee agrees to name Lessor and Lessor's mortgagee as additional insured parties under the policies required by this Section 10 and to deliver to Lessor and Lessor's mortgagee certificates evidencing such coverage within sixty (60) days of the Effective Date. Throughout the Term, Lessor shall maintain comprehensive public liability insurance, property damage and all-risk hazard insurance on the Common Areas, buildings (excluding the Demised Premises), appurtenances and other improvements constituting the Shopping Center. Such insurance shall (i) be carried with reputable companies licensed to do business in the state in which the Demised Premises is located; (ii) have liability limits of at least $5,000,000.00 for each occurrence, bodily injury and property damage combined; (iii) provide for full replacement value for the buildings and improvements covered thereunder; and (iv) not be subject to change, cancellation or termination without at least thirty (30) days' prior written notice to Lessee. Lessor agrees to promptly provide to Lessee a certification or duplicate original of such insurance upon request therefor. Notwithstanding the foregoing, Lessee shall obtain a Builders Risk policy as provided in Section 4 above. Notwithstanding anything to the contrary contained herein, as long as Lessee's net worth shall exceed One Hundred Million Dollars ($100,000,000.00), it shall have the right to self-insure for any of the insurance or bonding required under this Lease.

11.   **ACCESS BY LESSOR:** Lessor and its authorized representatives shall have the right to enter the Demised Premises at all reasonable times to examine the condition thereof and

to make all necessary repairs required of Lessor under this Lease, but such rights shall be exercised in a manner so as not to interfere unreasonably with the business of Lessee. At any time within six (6) months prior to the expiration of this Lease or any renewals hereof, Lessor, with the express written permission of Lessee, may show the Demised Premises to prospective purchasers or tenants, and within such period, with the express written permission of Lessee, may attach to the Building or erect on the Demised Premises a notice advertising said property for sale or letting.

12.     **UTILITIES AND WASTE DISPOSAL:** Lessee agrees to pay for the following utilities used by Lessee upon or within the Demised Premises from and after the Effective Date: electricity, gas, water and sewer, provided suitable meters are installed by Lessor to measure Lessee's consumption of same.   To the extent that the Expanded Store as identified in Exhibit "B", whether or not re-parceled, results in electricity, gas, water and sewer usage from other existing, and jointly used meters, Lessee shall be responsible for its pro-rata share based upon Lessee's square footage, in addition to utilities used and measured by existing meters. Lessee shall provide for the regular removal of all trash, rubbish and garbage from the Demised Premises resulting from Lessee's activities on the Demised Premises from and after the Effective. Date.

13.     **CONDEMNATION:** If the whole of the Demised Premises shall be taken or condemned by any competent authority for any public use or purpose during the Term, Lessee reserves the right to prosecute its claim for an award based on its leasehold interest for such taking without impairing the rights of Lessor. In the event that part of the Shopping Center shall be taken or condemned and the part so taken includes the Building, or any part thereof, on the Demised Premises, or the part so taken shall remove ten percent (10%) or more of the parking area serving the Demised Premises, or the part so taken shall remove from the Shopping Center ten percent (10%) or more of the lineal front footage which runs parallel to any adjacent street or the highway thereof, or the part so taken shall remove or separate twenty-five percent (25%) of the total parking area, or the part so taken shall result in cutting off any direct access from the Shopping Center to any adjacent public street or highway, then, and in any such event, Lessee may elect to terminate this Lease as of the date of the taking by such authority. Lessee shall give notice of its election to terminate to Lessor in writing within ninety (90) days after official notice from the condemning public authority to Lessee of the taking. In the event Lessee shall fail to exercise such option to terminate this Lease, or if part of the Shopping Center shall be taken or condemned under circumstances whereby Lessee does not have such option, then in either such event, the Rent for the balance of the Term shall be abated and adjusted in an equitable manner.

14.     **DEFAULT CLAUSE:**

        (a)     If at any time Lessee shall default in the payment of Rent or any installment thereof for more than ten (10) days after Lessee's receipt of written notice of such default by Lessor, or if Lessee shall default in the performance of any other covenant, agreement, condition, rule or regulation herein obligating Lessee and such default shall continue for thirty (30) days after Lessee's receipt of written notice of such default by Lessor, (or if the default cannot be cured within such thirty (30) day period, if Lessee shall not within such 30-day period commence such cure and thereafter diligently pursue same to its completion), Lessor shall thereafter have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom Lessee and its effects

-6-

or other occupants thereof and their effects without any liability therefor. In such case, Lessor shall use reasonable efforts to relet the Demised Premises or any part thereof at the highest rental rate reasonably attainable as the agent of Lessee, with Lessee remaining liable to pay Lessor Rent and other charges reserved herein for the balance of the Term, less the actual rental received for the Demised Premises for the same period; or Lessor at its option may terminate this Lease, thereby releasing Lessee from any further liabilities hereunder. Should the actual rental received for the Demised Premises be less than the Rent and Lessor has not terminated the Lease, Lessee shall pay such deficiency on a monthly basis. The remedy provided herein for the breach of any obligation shall be exclusive, with the exception that Lessor may bring an action for any Rent which has accrued and is otherwise delinquent. Consequential damages are not recoverable.

    (b)    If Lessor shall fail to pay any taxes to the extent that Lessor pays such assessments, mortgage interest, amortization, or any other charges accruing against the Demised Premises, or fail to perform any of the conditions or covenants hereof on its part to be performed, Lessee may give written notice of such default to Lessor, and if Lessor shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Lessor shall not within such period commence such cure and thereafter diligently complete the same), then Lessee shall have the right, at its option, to cure such default, and the amount expended by it therefor and a reasonable charge for administrative expenses may be deducted by Lessee from Rent thereafter becoming due.  Lessee shall, upon request, submit to Lessor receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which are Lessor's responsibility to remedy pursuant to Section 7, Lessee shall immediately notify Lessor or its duly appointed agent, orally, by telecopy or by Federal Express or similar overnight delivery service, and upon the failure of Lessor to correct promptly or take necessary steps to correct such urgent situation, then Lessee shall have the right to correct the same and be reimbursed as hereinabove provided.  In the event the Demised Premises shall be rendered untenantable by reason of Lessor's failure to perform any obligation described herein, including without limitation Lessor's failure to make any repairs arising under Section 7 above, all Rent due hereunder shall wholly abate until Lessor shall have satisfactorily performed such obligation. Alternatively, Lessee shall have the right to perform such obligations at the expense of Lessor as hereinabove provided.

    15.    ASSIGNMENT AND SUBLETTING: Lessee shall have the right at any time, without Lessor's consent, to sublet the Demised Premises or any part thereof or to assign this Lease and the assignee or sublessee may use the Demised Premises for any lawful purpose. In the event of an assignment or subletting, any reference to Lessee in this Lease will be interpreted to include such assignee or sublessee; provided that no such subletting or assignment shall relieve Lessee of any of its financial obligations hereunder. Each sublease or assignment shall provide that it is subject and subordinate to the rights of Lessor under this Lease and to any renewal, amendment or modification hereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.  The provisions for such subordination shall be self-operative so that no further instrument of subordination need be required by any mortgagee.  Lessor agrees that the continued enforceability of the subordination agreement by Lessor or its mortgagee shall be conditioned upon Lessee being in possession of a valid non-disturbance agreement executed by all present and any future mortgagees in the form attached as Exhibit G regarding the Lease and,

if applicable, any Easement, Covenant and Restriction Agreement affecting the Demised Premises.

16.    **MUTUAL WAIVER OF SUBROGATION:** Each of Lessor and Lessee hereby releases the other and its respective employees, agents and every person claiming by, through or under either of them, from any and all liability or responsibility (to them or anyone claiming by, through or under them by way of subrogation or otherwise) for any loss or damage to any property (real or personal) caused by fire or any other insured peril covered by any insurance policies for the benefit of either party, even if such loss or damage shall have been caused by the fault or negligence of the other party, its employees or agents, or such other tenant or any employee or agent thereof.

17.    **FIRE CLAUSE:** The term "Total Destruction" of the Demised Premises as used in this Section is defined as damage to or destruction of the Demised Premises by fire or other causes covered by the All-Risk insurance referred to in Section 10 to the extent that the cost of repair or reconstruction will exceed fifty percent (50%) of the cost of rebuilding or reconstructing the Demised Premises at the time of such disaster. The term "Partial Destruction" of the Demised Premises as used in this Section is defined as such damage to the extent that the cost of repair or reconstruction will be less than fifty percent (50%) of the cost of rebuilding or reconstructing the Demised Premises at the time of such disaster.

    (a)    In the event of Total Destruction of the Demised Premises during the first twelve (12) years of the original Term, or in the event of Partial Destruction of the Demised Premises at any time during the Term, Lessor shall promptly rebuild or restore the Demised Premises to as nearly as possible its condition immediately prior to such destruction or damage, such work to be commenced within sixty (60) days from the date of disaster and thereafter to be prosecuted with due diligence until such rebuilding or restoration is completed.

    (b)    In the event of Total Destruction of the Demised Premises during the last thirty-six (36) months of the original Term, or during any of the renewal of the Term, Lessee shall have the option, in addition to any rights under Section 24 hereof to extend this Lease under the same terms and conditions as those herein expressed for an additional term of eight (8) years from the time of the completion and acceptance of the reconstructed Demised Premises, such option to be exercised by Lessee giving written notice to Lessor within thirty (30) days after date of casualty.  Should Lessee exercise such option, Lessor shall, within sixty (60) days from receipt of written notice, commence the work of reconstructing the Demised Premises and thereafter shall prosecute said work with reasonable diligence until the Demised Premises have been reconstructed to as nearly as possible its condition immediately prior to the casualty.  Should Lessee fail to exercise such option within the time aforesaid, then this Lease shall terminate effective the date of the casualty.

    (c)    Should Lessor be prevented from commencing the rebuilding or restoration of the Demised Premises within the dates above provided, or if, after such commencement, Lessor should be prevented from performing said work because of delays beyond Lessor's control, the period of such delays shall not be counted in computing the dates hereinabove provided for the commencement and/or completion of the rebuilding or restoration of the Demised Premises.  Notwithstanding the foregoing, if, for any reason, Lessor should fail to commence and be diligently performing the work of rebuilding or restoration within one

hundred fifty-one (151) days from the date of the casualty, Lessee shall have the option of terminating this Lease by giving written notice to Lessor within thirty (30) days after the expiration of the one hundred fifty-one (151) day period.

(d)      All Rent shall be abated during the period the Demised Premises is damaged and untenable and for a period of thirty (30) days after the date reconstruction is completed, or until the date upon which Lessee shall reopen for business, whichever is earlier.

(e)      In the event of Partial Destruction of the Demised Premises, during the period the Demised Premises is damaged and/or undergoing restoration, all Rent shall abate unless Lessee chooses to occupy a portion of the Demised Premises, in which event Lessee shall pay rental in such proportion to the entire Rent herein reserved as the area in the Demised Premises occupied by Lessee bears to the total space in the Demised Premises.

(f)      In the event of termination of this Lease, any unearned Rent paid by Lessee shall be prorated and refunded to Lessee.

18.      **TAXES:** Lessee agrees to pay all real estate taxes and special assessments which are assessed against the Demised Premises and the parking lot serving the Demised Premises, all designated as the Wal-Mart Tax Plat Area prior to the CofO Date on Exhibit "H" and Wal-Mart Tax Plat Area after the CofO Date on Exhibit "I" (the Site Plan) during the Term or any extension or renewal hereof, provided that:

(a)      Lessee shall provide a separate tax parcel, and take such reasonable steps to re-parcel, at Lessee's expense, the Demised Premises as relates to the Expanded Store (which re-parceling shall be subject to approval by Lessor, which approval shall not be unreasonably be withheld, and in which re-parceling process Lessor shall fully co-operate) for tax purposes prepared and delivered to Lessor within ninety (90) days from the execution of this Lease, or

(b)      In the event the local taxing authority will not permit a separate tax plat, Lessor agrees to pay all such taxes and special assessments upon receipt of the bill. Lessor shall provide a copy of the bill accompanied by a copy of the paid receipt from the taxing authority to Lessee no later than thirty (30) days from the date said bill is due for payment without penalty. Within sixty (60) days after Lessor's delivery to Lessee of paid receipts, Lessee shall reimburse Lessor for Lessee's share of such taxes and assessments, based upon the acreage contained in the "Wal-Mart Tax Plat Area" as the numerator and the denominator shall be the total acreage being assessed for that tax bill or assessments. In no event shall Lessee be responsible for payment of any late charges or penalties for the non-payment of said bills by Lessor.

(c)      In the event that Lessor fails to pay said bill, Lessee may pay the bill and thereafter shall have the right to deduct Lessor's share, all late charges and penalties from the monthly Rent then next due. To the extent that said tax bill is mailed directly to Lessee, then Lessor shall not be obligated to pay any late charges and penalties, but such shall be paid by Lessee.

(d)      If, during the Term, Lessor receives notification of a change in assessment of the Demised Premises, Lessor agrees to provide a copy of said notice to Lessee within fifteen (15) days of Lessor's receipt of said notification, to allow Lessee the right to protest any increase in assessment. Lessor shall cooperate with Lessee, including the signing of any and all

-9-

documents reasonably requested by Lessee, in connection with the prosecution of any protest. In the event that Lessor fails to provide a copy of said notification, and the assessed value is increased, resulting in an increase in taxes or special assessments, Lessor agrees to pay said increase in taxes or special assessments for each and every bill received reflective of said increase, until such time as the Demised Premises are re-assessed and notification of same is provided to Lessee within fifteen (15) days from Lessor's receipt of same. Lessee agrees to cooperate with Lessor in filing any protest of such increase in assessment at the next opportunity. It is Lessor's intention to allow Lessee the ability to protest any increase in assessment which would result in an increase in the taxes or special assessments that Lessee is obligated to pay under the Lease. If Lessor fails to provide any notification of change in assessment, Lessee shall not be responsible for any increase in taxes or special assessments associated with such notification of change in assessment.

(e)     Lessor shall notify Lessee and all applicable taxing authorities of any transfer of all of or a part of the ownership of the Demised Premises. The notice shall be delivered in writing to Lessee and all applicable taxing authorities within fifteen (15) days from the effective date of the transfer and shall include any change or modification of the address of Lessor. Lessee shall not be responsible for any damages, late charges or penalties as a result of Lessee or the applicable taxing authorities not being notified within the time frame set forth herein.

19.     **LESSEE'S FIXTURES, EQUIPMENT AND GOODS:**  Any and all fixtures, equipment and goods installed by Lessee shall be and remain the property of Lessee, and Lessee may, at any time, remove any and all fixtures, equipment and goods installed by it in, on or about the Demised Premises; provided that Lessee shall promptly repair any damage or injury to the Demised Premises caused by such removal.  Any fixtures and equipment furnished by Lessor shall remain the property of Lessor and shall not be removed by Lessee unless Lessee purchases said equipment and fixtures from Lessor.

20.     **ALTERATIONS, IMPROVEMENTS, OR STOCKROOM ADDITIONS:** Lessee or any of its assignees or sublessees shall have the right to make any alterations, improvements, or stockroom additions to the interior of Demised Premises for the purpose of its business or the business of its assignees or sublessees; provided, that such alterations, improvements, or stockroom additions shall be made in accordance with the requirements of local ordinances and public authorities having jurisdiction thereover, and further provided that the value of the Shopping Center shall not be diminished thereby.  In making such alterations, improvements, or stockroom additions, Lessee may salvage any material or equipment that shall be removed or replaced.  Furthermore, Lessor will permit Lessee to enter any other building of the Shopping Center having a common wall with the Demised Premises and will secure for Lessee such permission from other tenants of the building, if any, for such work as may be necessary in connection with the alterations, improvements, or stockroom additions to the Demised Premises.  Lessee agrees to provide Lessor with reasonable notice in order to obtain such permission and agrees to coordinate said work and cooperate with tenants having a common wall and the operation of their businesses in order to minimize disruption to the same.  Lessor agrees to sign promptly applications, permits or consents that may be required by public authorities in connection with such alterations, improvements, or stockroom additions to the Demised Premises as and when requested by Lessee, its assignees or sublessees. Lessee agrees

to keep the Demised Premises free of liens for labor or materials supplied as a result of any alterations, improvements or stockroom additions in accordance with Section 29 herein.

21.    **COVENANT OF TITLE AND QUIET ENJOYMENT:** Lessor represents and warrants that Lessor owns the Shopping Center, including the Demised Premises, the access and parking areas being a part thereof, in fee simple absolute, free and clear of all encumbrances, except (i) such mortgages or deeds of trust that Lessor may place on the Demised Premises for the purpose of financing, and (ii) such encumbrances that do not interfere with Lessee's rights under this Lease or Lessee's use of the Demised Premises; that the Demised Premises are and shall be subject to no leases, easements, covenants, restrictions or the like which in any manner prevent or restrict Lessee's use of the Demised Premises for any lawful purpose or which would interfere with the construction of the Expanded Store, as described in Section 29 below; and that the real property constituting the Shopping Center contains no hazardous wastes, toxic materials, asbestos or environmental pollutants. The person(s) executing this Lease on behalf of Lessor represent and warrant that they are the only person(s) required to execute this Lease in order to bind Lessor and that Lessor has the full right and lawful authority to enter into this Lease for the Term; and that, if Lessee is not in default herein, Lessee's quiet and peaceable enjoyment of the Demised Premises during the Term or any extensions hereof shall not be disturbed or interfered with by anyone and Lessee shall enjoy all of the rights herein granted without any hindrance, molestation or interference by any person(s) and Lessor shall indemnify and hold Lessee harmless from and against any claim, action, losses, costs, expenses, liabilities and judgments arising in connection with the breach of any of the foregoing representations and warranties. Notwithstanding the foregoing, the Demised Premises is subject to the ECR's, as will be amended by the Second Amendment set forth on Exhibit "D", which shall be binding and recorded in the event Wal-Mart constructs the Expanded Store. Further, Lessee warrants that the existing Subordination, Non-disturbance and Attornment Agreement (the "SNDA") attached as Exhibit "J" remains valid and enforceable.

22.    **TITLE INSURANCE:**

(a)    Upon execution of this Lease, Lessor shall order from a reputable and national title insurance corporation (the "Title Company"), for delivery to Lessee within twenty (20) days after the later of (i) the date of this Lease, or (ii) the re-parceling of the Premises for the Expanded Store (unless such time is otherwise extended in writing by Lessee), a commitment for a policy of leasehold title insurance (the "Commitment") setting forth the state of title to the Demised Premises and all exceptions thereto, including, without limitation, rights-of-way, easements, restrictions, reservations, covenants, liens, encumbrances, leases, estates and any other conditions affecting the Demised Premises which would appear in a policy of leasehold title insurance, if issued, and a copy of any instrument creating an exception to title. Lessee may advise Lessor of any unacceptable exceptions in the Commitment, and Lessor may undertake to eliminate or modify such unacceptable exceptions to Lessee's reasonable satisfaction. If Lessor does not eliminate or modify such unacceptable exceptions within thirty (30) days after being advised of same, Lessee may terminate this Lease by notice to Lessor, in which event neither party hereto shall have any further obligations to the other hereunder. Failure of Lessee to object to any exceptions in the Commitment shall not constitute a waiver of any of Lessee's rights under any other Sections of this Lease.

(b)     Within ninety (90) days after issuance of the Commitment (or such other period as requested by Lessee), Lessor, at Lessor's sole cost and expense, shall procure an ALTA Form B policy of leasehold title insurance (the "Title Policy") insuring the leasehold estate to the Demised Premises to Lessee and Lessee's right under this Lease with respect to the use of the Common Areas thereby insuring Lessee against loss or damage by reason of defects in title to the Demised Premises, easements, restrictions, reservations, leases, liens, encumbrances, covenants and the like, said policy to be in an amount not less than the anticipated cost of the improvements on the Wal-Mart Tax Plat Area. If Lessor fails to pay for the Title Policy and as a result of such failure the Title Policy is not issued within the time specified above, Lessee shall have the right, at its option, to pay the cost of the Title Policy and deduct the amount of said cost from the next due payment(s) of Rent.

23.     **RIGHT TO MORTGAGE:** Lessee, upon request of Lessor, will subordinate this Lease to any first mortgage which now or hereafter affects the Demised Premises and to any renewals, modifications or extensions of such mortgage. At Lessor's written request, in which Lessor furnishes Lessee with the name and address of mortgagee, Lessee will execute and deliver a subordination, non-disturbance and attornment agreement, which will subordinate this Lease to any first mortgage and will name such mortgagee as an additional insured in any policies required by Section 10 and deliver to such mortgagee copies of all notices required hereunder; provided, that such instrument shall be in a form acceptable to Lessee, and further provided that a duplicate original thereof, fully executed by such first mortgagee, shall forthwith be delivered to Lessee. Lessor agrees that the continued enforceability of the subordination agreement by Lessor or its mortgagee shall be conditioned upon Lessee being in possession of a valid non-disturbance agreement executed by all present and any future mortgagees in the form attached as Exhibit G regarding the Lease and, if applicable, any Easement, Covenant and Restriction Agreement affecting the Demised Premises. Notwithstanding the foregoing, Lessee and Lessor agree to the enforceability of the SNDA attached as Exhibit "J"; provided that, as a condition of Lessee's obligations hereunder, Lessor shall execute and cause the existing lienholder on the Premises to execute, within thirty (30) days of the date of this Lease, an appropriate amendment to the SNDA, acceptable to Lessee, covering the Demised Premises, as expanded by this Lease. Further, Lessee acknowledges the Demised Premises is subject to the ECR's.

As further consideration for this subordination clause, Lessor agrees that it shall make no agreement, assignment of rent or otherwise, with any mortgagee whereby Lessor is required to obtain said mortgagee's permission in order to modify this Lease unless such proposed modification will materially amend or modify the Lease and in addition will have an adverse effect on the mortgagee's interest therein. Such material modifications include but are not limited to substantial advance payments of Rent, reduction of Rent and modification in the length of the Term.

24.     **EXTENSION OR RENEWAL:** Lessee shall have the right and option to renew this Lease and extend the Term hereof for fourteen (14) consecutive periods of five (5) years each, upon the same terms and conditions and for the same Rent (subject to the rent increase adjustments provided for in Section 3 above), by giving Lessor at least sixty (60) days previous written notice of its election to make each such extension. Upon the giving of each such notice within the time specified therefor, this Lease shall be considered as having been extended for the

CMM:cmm 437094.15 6/15/2004

period specified in such notice without the necessity of the execution of any additional instruments.

25.  **NOTICES:** All notices or requests under this Lease shall be given by certified mail to the addresses shown on Page One of this Lease and sent to the Attention: Legal Department with a copy to the attention of: Property Management. Each properly-addressed notice or request sent by certified mail shall be deemed given and served upon being deposited in the United States mail, postage prepaid.

26.  **SHORT FORM/MEMORANDUM OF LEASE:** Lessor and Lessee agree to execute at the time of execution of this Lease a Short Form Lease or Memorandum of Lease for recording purposes, setting forth the legal description of the Demised Premises and the Term and referring to other pertinent provisions. Costs associated with the preparation and recording of the Short Form/Memorandum of Lease shall be paid by the party recording such document.

27.  **CONSENT:** Lessor and Lessee covenant that whenever their consent or approval is required hereunder, they will not unreasonably withhold or delay such consent or approval.

28.  **COMMON AREAS:** Lessor, at its sole cost and expense, shall, during the Term, maintain the common areas ("Common Areas") of the Shopping Center in a neat, clean, safe and orderly condition and shall keep the real property insured as set forth in Section 10 herein. The Common Areas shall include the vehicle parking and other common areas of the Shopping Center, including without limitation, any common roadways, service areas, driveways, areas of ingress and egress, sidewalks and other pedestrian ways, landscaped areas, enclosed malls, utility systems and the like, but shall not include the Demised Premises or the Building itself or any other leasable areas of the Shopping Center. The maintenance by Lessor includes, subject to paragraphs 7 and 8 hereof, without limitation, the following:

(a)  Maintaining the surface of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly-covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality, use and durability;

(b)  Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the area to the extent reasonably necessary to keep the area in a clean and orderly condition;

(c)  Placing, keeping in repair and replacing any necessary appropriate directional signs, markers and lines; and

(d)  Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary.

Lessee shall pay to Lessor its pro rata share of the cost of said maintenance (determined by dividing the square footage of the Demised Premises by the total building square footage of the Shopping Center). The total building square footage to be increased upon the issuance of the CofO. Lessor agrees to furnish Lessee with copies of all paid invoices received by Lessor for Common Area maintenance costs and to furnish Lessee with certified total building square footage figures with each billing of Common Area maintenance costs. Lessor acknowledges that

-13-

CMM:xmm 437094.15 6/15/2004

Lessee shall have no obligation to render payment to Lessor for Common Area maintenance costs incurred unless and until Lessor provides Lessee with the above-mentioned items. Lessee shall have the right to audit Lessor's records to determine the validity of Common Area maintenance costs. Lessor may bill Lessee for such Common Area maintenance costs no more frequently than quarterly. Notwithstanding the foregoing, Lessee shall be responsible for electricity used for the light poles in the W-M parcel identified on Exhibit H or I as may be applicable.

## 29.   LESSEE'S EXPANSION:

(a)    Lessee may expand the floor area of the Building on the Demised Premises by constructing an Expanded Store as described in Section 1(a) above (hereinafter the "Expanded Store") in the area consistent with the plans, elevations and color scheme as configured and laid out on Exhibit "B".

(b)    Lessee may thereafter commence to construct and diligently pursue to completion the construction of the Expanded Store in accordance with expansion plans that are attached as Exhibit "B" and specifications which shall be prepared by Lessee, at Lessee's expense, and promptly delivered to Lessor. Such expansion plans and specifications shall conform to all applicable laws, ordinances, rules and regulations of any public authority or Board of Insurance Underwriters or similar agency having jurisdiction over the construction of the Expanded Store. Lessee shall also make all changes, alterations, improvements and repairs to the Demised Premises as may be necessary to incorporate the Expanded Store as an integral part thereof. Upon the completion of the Expanded Store, the Expanded Store shall become a part of the Demised Premises for all purposes set forth in this Lease.

(c)    Lessee agrees to keep the property free and clear of mechanics liens and indemnify Lessor for the same. In the event that a mechanics lien is recorded, Lessee shall cause the same to be removed or post a surety bond for the release of same, within ten (10) days of Lessor's written request.

(d)    Lessee's rights to commence construction of the Expanded Store shall be conditioned upon the transfer by Sam's Real Estate Business Trust ("Sam's") to Lessor, for nominal monetary consideration, of certain adjacent land acceptable to Lessor and Lessee, which land has or will become part of the Demised Premises hereunder. In the event that (i) on or before June 30, 2005 (but excepting events of force majeure), such transfer by Sam's does not occur or the construction for the Expanded Store has not by then commenced, or (ii) on or before June 30, 2005, Lessee has not obtained issuance of a building permit with respect to the Expanded Store and Lessee notifies Lessor in writing that it has, in Lessee's sole discretion, determined that it will not be able to obtain such building permit, then, unless otherwise extended or agreed by the parties in writing, this Lease may be terminated thereafter by written notice of either party to the other, and in which event of termination, the Original Lease Agreement shall be reinstated to the fullest extent possible, and the parties shall thereafter fully co-operate in restoring each of the parties (and Sam's) and the Demised Premises to substantially the same condition under the Original Lease Agreement as existed prior to the date of this Lease.

-14-

30.   **MISCELLANEOUS:**

(a)     Upon the termination of this Lease, whether by lapse of time or otherwise, the Demised Premises and the improvements thereon shall belong to Lessor, subject to the terms of Section 19 regarding fixtures, equipment and goods of Lessee.

(b)     One or more waivers of any covenant or condition of this Lease by Lessor or Lessee shall not be construed as a waiver of the further breach of the same covenant or condition, or of any other covenant or condition herein contained.

(c)     The covenants, conditions and agreements of this Lease shall be binding upon and shall inure to the benefit of the successors, heirs and assigns of the parties hereto.

(d)     This Lease and the terms hereof may be changed or modified only by execution of such change or modification in writing by the parties hereto or their successors, heirs and assigns.

(e)     If Lessee remains in possession of the Demised Premises after the expiration of the Term without the execution of a new lease or an agreement extending the Term hereof, or without the exercise of the renewal options herein granted to Lessee, Lessee shall be deemed to be occupying the Demised Premises as a tenant at will from month to month, subject to all of the terms of this Lease as may be applicable to a month-to-month tenancy, and at the Rent provided for herein, prorated on a monthly basis.

(f)     The captions, Section numbers and table of contents appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of this Lease nor in any way affect this Lease.

(g)     If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby; and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

(h)     Lessee shall from time to time, within thirty (30) days after Lessor's request, execute and deliver to Lessor written Certificates in the form attached hereto as Exhibit "E" respecting the status of this Lease. Lessee agrees that such statement may be relied upon by any mortgagee, purchaser or assignee of Lessor's interest in this Lease, or the Demised Premises.

(i)     Lessor shall from time to time, within thirty (30) days after Lessee's request, execute and deliver to Lessee written Certificates in the form attached hereto as Exhibit F respecting the status of this Lease. Lessor agrees that such statement may be relied upon by any mortgagee, purchaser or assignee of Lessee's interest in this Lease, or the Demised Premises.

(j)     This Lease contains the entire agreement of the parties, and all prior communications, oral or written, are without any force and effect as it is the specific intent of the

-15-

CMM:crm  437094.15  6/15/2004

parties that this Lease alone sets forth the terms on which the parties have mutually agreed. Each party specifically agrees that it enters into this Lease based on its own understanding of the terms hereof and does not rely, in whole or in part, on any interpretation or representation of the other party. Each party agrees that this Lease is the result of good faith arms length negotiations.

(k)     This Lease does not create any obligation or relationship such as a partnership, joint-venture or other legal relationship under the laws of any state or the federal government, other than that of Landlord-Tenant. Any correspondence or other references to partners or other similar terms will not be deemed to alter, amend or change the relationship between the parties hereto unless there is a formal written agreement specifically detailing the rights, liabilities and obligations of the parties as to a new, specifically defined legal relationship.

(l)     This Lease and the Exhibits attached hereto, which are or may in the future become a part of this Lease, supersede any prior agreements between the parties concerning the Demised Premises, and no oral statements, representations or prior written matter relating to the subject matter hereof, but not contained in this Lease, shall have any force or effect. Nothing contained in this Lease, including the site plan on Exhibit B, shall give rise to duties or covenants on the part of Lessee, express or implied, other than the express duties and covenants set forth herein. ANY REPRESENTATION OF LESSEE'S AGENTS OR ANY THIRD PARTY WHICH IS NOT INCORPORATED IN THIS LEASE SHALL NOT BE BINDING UPON LESSEE AND SHOULD BE CONSIDERED AS UNAUTHORIZED.

(m)     This Lease shall be interpreted and construed in accordance with the laws of the State of Nevada and any dispute with respect to it and the rights and duties thereby created shall be litigated in U.S. District Court for the State of Nevada.

(n)     In the event Lessor obtains an offer it is willing to accept, in Lessor's sole discretion, to sell the Demised Premises (separately or as part of the Shopping Center) to an unrelated third party (said offer or agreement is hereafter referred to as the "Sales Offer"), Lessor hereby gives Lessee a Right-Of-First-Refusal to purchase the Demised Premises, on the same terms and conditions provided in the Sales Offer. Lessee shall have twenty (20) days after receipt from Lessor of a copy of such Sales Offer accompanied by Lessor's offer to sell the Demised Property to Lessee in which to exercise such right, which Lessee shall do by executing and delivering to Lessor a signed agreement containing substantially the same business terms and conditions as the Sales Offer. If Lessee shall not deliver such signed agreement to Lessor within such twenty (20) day period, then Lessee shall be deemed to have failed to exercise such right with respect to the Sales Offer. Notwithstanding the foregoing, Lessor and Lessee agree and understand that Lessor shall have the right to sell, gift, transfer or assign (the "Permitted Transfer") all or any portion of its interest in the Demised Premises or this Lease, without Lessee's consent, provided that (a) said Permitted Transfer is either to (i) a family member(s) or heir(s) or lineal descendents of Howard A. Wells and/or Janet E. Wells and/or James and Cheryl Wells ("Related Party"), (ii) a new entity which is controlled by the blood members of the Wells family or heir(s) or lineal descendants of Howard and Janet Wells and/or James and Cheryl Wells (the "Related Party"), (b) Lessor provides Lessee with at least thirty (30) days prior written notice of said Permitted Transfer, (c) such transferee of the Permitted Transfer assumes in writing all of the existing and future obligations of Lessor under this Lease; and (d) no such further transfer shall be permitted except to a Related Party. Lessee understands and agrees that

-16-

Lessee's Right-Of-First-Refusal under this Section shall not apply to any such Permitted Transfer or Related Party.

(o)    Lessee consents to the location and size of the retail pads on the Shopping Center designated on the Site Plan, Exhibit B, as a "Pad", and approves the same for future construction and/or expansion of buildings or structures as so indicated.

(p)    This Lease may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which, together, shall constitute one and the same instrument.

CMM:arren 437094.15 6/15/2004

IN WITNESS WHEREOF, the parties have executed this Lease the day and year first hereinabove written.

LESSOR:

W & W PARTNERSHIP, a Nevada general partnership

By: RAINBOW SPRINGS, INC., a Nevada corporation
Its: General Partner

By: _____
    Howard R. Wells, Jr.
Its: President

By: HJW PROPERTIES, LTD., a Nevada corporation
Its: General Partner

By: _____
    Howard A. Wells, Jr.
Its: President

WAL-MART REAL ESTATE BUSINESS TRUST, a Delaware statutory trust

By _____

Its _____

IN WITNESS WHEREOF, the parties have executed this Lease the day and year first hereinabove written.

LESSOR:

W & W PARTNERSHIP, a Nevada general partnership

By: RAINBOW SPRINGS, INC., a Nevada corporation
Its: General Partner

By:_____
Howard A. Wells, Jr.
Its: President.

By: HJW PROPERTIES, LTD., a Nevada corporation
Its: General Partner

By:_____
Howard A. Wells, Jr.
Its: President

WAL-MART REAL ESTATE BUSINESS TRUST, a Delaware statutory trust

By_____

Its _____ Assistant Vice President

Approved as to legal terms only
by _____
WAL-MART LEGAL DEPT.
Date: 6/18/04

CMM:emm 437094.15 6/15/2004

## EXHIBIT A

### (Legal Description)

A parcel of land located generally between Spring Mountain Road and Twain Avenue, near Rainbow Boulevard, in Clark County, near Las Vegas, Nevada, further described as follows (REVISED LEGAL, to be replaced by Record of Survey legal description when recorded):

**EXHIBIT A TO LEASE AGREEMENT**